# EXHIBIT I

Law Offices of
# JOHN E. SHARP
24 Professional Center Parkway, Suite 100
San Rafael, CA 94903

John E. Sharp
john@johnsharplaw.com

Telephone: (415) 479-1645
Facsimile: (415) 479-8444

August 24, 2017

**VIA EMAIL & US MAIL**

Jeremy Tejirian
Planning Manager
Community Development Agency
County of Marin
3501 Civic Center Drive, Suite #308
San Rafael, CA 94903

      **RE: Seaplane Adventures Use Permit Review**

Dear Mr. Tejirian:

This office represents Seaplane Adventures, and its owners Aaron and Tiffany Singer (hereinafter "Seaplane Adventures"), the permittees and lessees of the subject property at Commodore Marina LLC, commonly known as 242 Redwood Hwy, Mill Valley.

Please include this correspondence, as well as any other correspondence received by your office in the administrative record of proceedings referenced above, and in the materials for the Planning Commission review in conjunction with the hearing on August 28, 2017. Please provide the undersigned with copies of all notices, agendas, staff reports and/or other writings generated in conjunction with the pending proceedings.

For the reasons set forth below, the County's proceedings to revoke or modify the conditions of Seaplane's use permit are without legal merit and should be withdrawn.

The conditions currently under review arose from a use permit originally granted in 1953 and modified in 1981. As will be discussed in more detail below, in order for modification of conditions to a use permit to be modified, due process, including findings, supported by substantial evidence, of violation of the conditions of the use permit must occur. Initially, however, a threshold issue prevents the current action from going forward.

## THE PREEMPTION DOCTRINE CONTROLS THE SUBJECT PROCEEDINGS

The staff report generated in conjunction with the hearing scheduled for August 28, 2017 accurately identifies that the federal preemption doctrine controls. (See *City of Burbank v. Lockheed Air Terminal, Inc* (1973), 411 U.S. 624, a United States Supreme Court decision which addresses remarkable similarities to the issues at hand in the instant matter.).

Preliminarily, it must be noted that Seaplane Adventures is regulated by 11 federal, state, and local agencies including, without limitation, the following:

- Federal Aviation Administration
- Federal Drug Testing and Abatement Division
- US Dept. of Transportation
- California Public Utilities Commission
- US National Parks Service
- US Dept. of Fish & Game
- Bay Area Conservation District Commission
- US Army Corp of Engineers
- CA Office of Tourism
- CA Dept of Public Works

Specifically, the Federal Aviation Administration (FAA) regulates and promulgates policies with regard to the regulation of said aircraft. Without limitation, the regulations pursuant to which Seaplane Adventures operates are set forth at 14 Code of Federal Regulations Parts 91, 61, 119, 135, and 141. Where the federal government has promulgated a pervasive scheme to regulate an area of activity, local governments are precluded from interfering. In the seminal decision of *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624 (1973), the United States Supreme Court struck down a local ordinance which purported to control aircraft noise, as having been preempted by the FAA and EPA. In so doing, the Court referred to the Federal Aviation Act of 1958 which, at Section 1108(a) provides, in part:

> "The United States of America is declared to possess and exercise complete and exclusive national sovereignty in the air space of the United States ...."

The complaints underlying the recommended actions to the Planning Commission, with regard to the number of commercial aircraft at the base, are driven by noise-based considerations and, as such, are preempted pursuant to the Supremacy Clause and the Commerce Clause of the United States Constitution. To the extent the County's current action seeks to address noise complaints, whether directly, or by limiting frequency or type of flight activity, the preemption doctrine applies. The County may not do indirectly that which it is prohibited from doing directly.

## SEAPLANE ADVENTURE'S VESTED RIGHTS DICTATE THAT ITS USE PERMIT IS NOT SUBJECT TO REVOCATION UNLESS VIOLATED

The holder of a conditional use permits owns a vested right in the permit. *Avco Community Developers v. South Coast* (1976) 17 Cal.3rd 785; *Malibu Mountains Recreation, Inc. v. County*

*of Los Angeles* (1998) 67 Cal.App.4th 359. No action may be taken with reference to revocation or modification of such permit without due process. In California, said due process is set forth at Code of Civil Procedure Section 1094.5, and case law interpreting that section.

Here, no findings exist to support the conclusion that condition 5 or any condition of the 1981 use permit, have been violated. In order for action on the permit to be taken, findings must be made and substantial evidence to support said findings must appear on the record, taken as a whole. For example, in the case of *Topanga Association for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3rd 506, the California Supreme Court ruled that the local agency, "must render findings sufficient both to enable the parties to determine whether and on what basis they should seek review, and, in the event of review, to apprise a reviewing court of the basis for the Board's action." (*Ibid* at p.514). In turn, the findings are required to, "bridge the analytic gap between the raw evidence and the ultimate decision." (*Ibid* at p. 515).

Seaplane Adventures notes that, in the Staff Report for the hearing of August 28, 2017, a purported rationale for modifying Seaplane's permit conditions is identified. Specifically, at page 4, Staff references the 2003 Development Code, to the extent the Development Code at §22.112.060 references previous use permits in effect. There is some speculation that the 2003 Development Code rendered the Seaplane Adventures business legal non-conforming.

It is stated in the August 28, 2017, Staff Report that the "changed conditions" do not have to do with any violation or activity by Seaplane Adventures; rather, the "changed conditions" consist of after-accepted regulatory schemes by the County. Such conditions are not legally supportable as a basis for regulation or modification of a vested conditional use permit, such as that held by Seaplane Adventures.

Whether one analyzes Seaplane Adventures as being subject to Development Code at §22.112.060 (previous use permits in effect) or as a legal non-confirming use, the vested rights doctrine leads to the same result; that is, absent a showing of violation of existing conditions to the existing use permit, supported by findings and substantial evidence (which, upon review by a court, may be reviewable under the independent review standard), Seaplane's rights may not be disturbed either by revocation or by modification of existing conditions.

As a practical matter, Seaplane Adventures is concerned that attempts to modify, rather than outright revoke its use permit will be viewed as a "compromise" position. This is not only legally unsupportable, but Seaplane Adventures points out that the suggested modifications of its conditions of approval will have an impact upon its ability to do business, such that its viability would be in jeopardy; put another way, a substantial property right would be lost in the event the modification suggested by Staff ("alternative C.") is adopted. This would substantially jeopardize Seaplane's property right as described above.

## THE RECORD REFLECTS NO EVIDENCE OF VIOLATION

Staff has presented no evidence of any violation, nor any changes in Seaplane's operation since said operation was last reviewed.

In fact, Staff accurately acknowledges that Seaplane Adventures has operated within the conditions of its use permit. The only change in conditions arises from changes to county ordinances which were adopted well after the current conditional use permit. As such, there is no basis to adopt the resolution accompanying the agenda report. In fact, no action whatsoever is called for.

## AT LEAST ONE RECENT MARIN COUNTY CASE HAS RESULTED IN JUDGMENT AGAINST THE COUNTY, UNDER SIMILAR CIRCUMSTANCES

In the case of *Pasternak v. County of Marin*, Marin County Superior Court No C6094435, an action was brought by a use permit holder operating a stable in West Marin. While not binding legal authority, the principles upon which the Marin County Superior Court ruled against the County in that matter are remarkably similar to those at issue in this review; specifically, the Court in rejecting the County's attempt to affect that applicant's permit stated:

> "Petitioner argues that the Board of Supervisors' 2016 decision to modify petitioner's 2010 use permit was not supported by legally adequate findings, in violation of Code of Civil Procedure Section 1094.5 (B)."

The Court went on to state:

"The primary question raised by Petitioner here is whether the Board of Supervisors made a finding that 'one or more of the conditions of the permit have not been met'. Absent such a finding modification is not permitted, and abuse of discretion must be found."

The Court went on, in an eight-page tentative ruling, to hold that a Staff Report, referencing "public complaints" and a "large number of **alleged** zoning and building violations" (emphasis added) did not amount to any finding of a permit violation. In the face of Staff recommended modifications to conditions of the use permit in that matter, the Court found that the County abused its discretion in violation of Code of Civil Procedure Section 1094.5 by failing to make sufficient findings as to Petitioner's conduct and failing to make sufficient findings as to modification to that Petitioner's parking/vehicle permit.

The importance of the decision in the Pasternak matter is that the facts and legal authority relied upon by the Marin County Superior Court are strikingly similar to those at issue in this matter, and should be viewed as cautionary in the context of Seaplane Adventures use permit and recommended modifications.

## CONCLUSION

Seaplane Adventures has operated, since its inception, within the conditions of approval of its use permit. As such, no legal basis exists to modify those conditions and the Planning Commission's recommendation should be that no action be taken.

Aaron Singer will appear at the hearing of August 28, 2017, together with the undersigned, to expand upon the matters set forth in this letter and to respond to any questions the Planning Commission may have.

Very truly yours,
LAW OFFICES OF JOHN E. SHARP

John E. Sharp

JES/ms

**EXHIBIT J**

# MARIN COUNTY PLANNING COMMISSION

# RESOLUTION NO. PC17-007

## A RESOLUTION RECOMMENDING THAT THE BOARD OF SUPERVISORS MODIFY THE COMMODORE MARINA LLC SEAPLANE BASE USE PERMIT

### ASSESSOR'S PARCELS: 052-247-01 and -02

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SECTION I: FINDINGS

1. **WHEREAS,** the Marin County Planning Commission has reviewed the 1981 Commodore Marina Seaplane Base Use Permit in reliance on a stipulation of the original 1953 Use Permit for the seaplane base which stated the following: "The Marin County Planning Commission reserves the right to revoke or review this Use Permit, after holding a public hearing thereon, said revocation and review to be instigated by the Commission at no particular time, but only when changed conditions seem to warrant." Those changed conditions warranting the Commission's review include changes to zoning regulations since the Use Permit and subsequent amendments were issued, increased development in the area, and changes to the Federal legal framework enabling local regulation of seaplane businesses. The property is located at 242 Redwood Highway and is further identified as Assessor's Parcels 052-247-01 and -02.

2. **WHEREAS,** on August 28, 2017, the Marin County Planning Commission held a duly noticed public hearing to take public testimony and consider the project.

3. **WHEREAS,** the project is Categorically Exempt from the requirements of the California Environmental Quality Act (CEQA) pursuant to Section 15301 of the CEQA Guidelines because it involves the continued operation of a legal seaplane base.

4. **WHEREAS,** the project would be consistent with Countywide Plan policy TR-1.7 "Direct Aviation Uses to Appropriate Locations" and program TR-1.p "Limit Aviation Uses" because it would not eliminate the ability of the seaplane base to continue operating.

5. **WHEREAS,** the project is consistent with the goals and policies of the Richardson Bay Special Area Plan and Tamalpais Area Community Plan because it would preserve natural resources and navigation channels on Richardson Bay and maintain existing access from the shoreline.

6. **WHEREAS,** the project is consistent with the mandatory findings for Use Permit revocation or modification under the express terms of the existing Use Permit.

   A. **That circumstances have changed since the grant of the Use Permit in 1953, as modified in 1981, by virtue of (1) changes to zoning regulations and increased development in the area; and (2) changes to the Federal legal framework governing local regulation of seaplane businesses; and that, therefore, the Use Permit should be modified.**

1

The changed circumstances that support modifying the conditions of the Use Permit are discussed below.

1. *Zoning Changes and Increased Development*

   In 1981, when the current Use Permit was approved, the property was zoned RCR (Resort, Commercial, Recreational). At that time, any resort or commercial recreation use was allowable, subject to securing a Use Permit. The current Use Permit was granted by the Planning Commission under this authority. In 1983, the BFC (Bayfront Conservation) overlay zone was applied to the property. While this did not change the underlying uses allowable, it did heighten the priority of environmental protection in recognition of the natural resources and habitats that shorelines and tidelands provide.

   The neighborhoods surrounding the inlet between De Silva Island and Seminary Drive have undergone substantial new development since 1981, including the De Silva Island development and homes and apartment buildings adjacent to the shoreline along Seminary drive. This area is also environmentally sensitive due to shoreline habitat. While this area may have always been sensitive, the importance of wetlands and shoreline habitats is better understood now then it was in 1981 when the Use Permit was previously modified. As a result, the BFC overlay district provides more stringent environmental protections than were in place in 1981. Seaplanes continue to use the inlet for maneuvers prior to take-off although it is outside of the airstrip established by the Federal Government in 1949.

   In 2003, the Development Code was adopted, which contained land use tables specifying which uses are allowable in each zoning district. The Development Code's land use tables, still in effect today, do not list "Airparks" as an allowable use in the RCR district.

   The regulatory circumstances have changed in two important respects since approval of the 1981 Use Permit: (1) applying the BFC overlay zone to better protect the bayshore environment; and (2) the zoning under the Development Code no longer allows airparks as a conditionally permitted use in RCR zones.

2. *Federal Law*

   While a review of the zoning history reveals that the seaplane base would not be permitted today, the changes to the legal framework for regulation since the original 1953 Use Permit was issued are perhaps more far reaching in their effects. Presumably unknown to the Planning Commission at the time they modified the Use Permit in 1981, the US Supreme Court had in 1973 issued a ruling in the City of Burbank v. Lockheed Air Terminal case that prohibited local jurisdictions from regulating aircraft noise, viewing it as an element of aviation regulation that was left exclusively to the authority of the Federal Government. This Federal preemption calls into question the validity of the 86 decibel noise limit, which is the lynchpin of the 1981 Use Permit. Further review of the Use Permit also indicates that the other operational restrictions related to take offs and landings may be difficult to enforce because local regulation is preempted by Federal law.

Based on the issues described above, the conditions of approval need to be modified to reflect the Federal preemption of conditions 1, 3, and 6 of the 1981 Use Permit as shown struck out below.

1. ~~No approaches over Strawberry Point except in the judgment of the pilot when necessary for safe operation. This condition is not intended to allow repeated approaches over Strawberry Point under unsafe conditions. Strawberry Point shall be defined as the area south of the Seminary.~~
2. Richardson Bay to be used for arrivals and departures only, i.e., no touch and go operations. A school shall be allowed to operate from the base, but training maneuvers, with the exception of sailing or idling type and initial takeoff and final landing must take place in other areas.
3. ~~No power approaches to be used except when necessary for safe operations.~~
4. Transient airplanes will not be allowed the use of base facilities by the operator.
5. Maximum of four commercial aircraft at the base, but only two may be simultaneously used for revenue producing purposes.
6. ~~At no time should any aircraft operated by the commercial operator exceed 86 decibels.~~

Conditions 2, 4, and 5 remain valid.

**B. That the public necessity, convenience, and general welfare do require the modification of the Use Permit.**

In order for the seaplane base operations to continue in a manner that does not adversely affect the public welfare, it must be carefully managed and regulated. This includes reviewing changed circumstances that may need to be reflected in modified conditions and ensuring that those conditions are clear and enforceable. Changed circumstances support modifying the conditions of the Use Permit, as indicated above in Finding A.

## SECTION II: ACTION

NOW THEREFORE, BE IT RESOLVED that the Planning Commission recommends that the Board of Supervisors modify the Commodore Marin Seaplane Base Use Permit to eliminate conditions 1, 3, and 6 of the 1981 Use Permit. All other conditions of the 1981 Use Permit should remain valid.

## SECTION III: ADOPTION

ADOPTED at a regular meeting of the Planning Commission of the County of Marin, State of California, on the 28th day of August, 2017.

AYES: MARGOT BIEHLE, CHRISTINA L. DESSER, DON DICKENSON, DAVID PAOLI, PETER THERAN

RECUSED: MARGARET CURRAN, JOHN ELLER,

NOES: NONE

_____
MARGOT BIEHLE, VICE CHAIR
MARIN COUNTY PLANNING COMMISSION

Attest:

_____
Ana Hilda Mosher
Recording Secretary

# EXHIBIT K

NEWS > BUSINESS

# Sheriff grounds Mill Valley seaplane over coronavirus





Aaron Singer, owner of Seaplane Adventures, stands by his company's planes in Mill Valley, Calif. on Friday, July 10, 2020. Singer has suspended flights after he says a Sheriff's deputy told him he would be fined if continued flying. (Alan Dep/Marin Independent Journal)

By RICHARD HALSTEAD | rhalstead@marinij.com | Marin Independent Journal

PUBLISHED: July 13, 2020 at 5:53 p.m. | UPDATED: July 14, 2020 at 7:13 a.m.

A Mill Valley seaplane business that uses Richardson Bay as its landing strip has been grounded due to COVID-19.

Aaron Singer, the owner of Seaplane Adventures, said a Marin County sheriff's deputy informed him on Friday that he would be fined $1,000-per-flight if he continued flying.

"We were about to go out on a proposal flight," Singer said, explaining that the client planned on proposing marriage while in the air. "We get that quite a bit."

Sgt. Brenton Schneider, a spokesman for the sheriff's office, said, "There have been multiple complaints from people in the community about the seaplane still operating when sightseeing tours are not allowed under the 'shelter-in-place' order."



# EXHIBIT L



# Federal Aviation Administration

## Considerations for State, Local, and Territorial COVID-19 Restrictions That Impact Air Transportation

The Federal Aviation Administration (FAA) is aware that States and localities have implemented or may consider implementing quarantine or travel restrictions on persons entering from certain locations within the United States and U.S. territories with sustained community transmission.

States, localities, and territories may wish to account for the following considerations when implementing any quarantine, movement, and/or screening requirements that impact air transportation. These suggestions draw on lessons learned from State, local, and territorial actions to date, as well as Federal guidance recommending unrestricted movement and access for critical infrastructure workers.

- Exempt critical air transportation workers – including airline and airport employees, as well as federal aviation and security personnel – from restrictions on movement and/or requirements for quarantine, isolation, or shelter-in-place declarations. See the following guidance from the Department of Homeland Security and Department of Transportation:
    - https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce
    - https://www.transportation.gov/coronavirus
    - https://www.faa.gov/other_visit/aviation_industry/airline_operators/airline_safety/safo/all_safos/media/2020/SAFO20003.pdf

- Identify the intent of any actions and the groups to be targeted by quarantine and travel/movement restriction procedures. Consider all travel options, including direct flights, connecting flights, and other modes of transportation, available to individual members of the targeted groups that may allow them to evade – whether intentionally or unintentionally – screening, travel restrictions, and/or quarantine measures.

- Identify the resources necessary for implementation, and the roles and responsibilities of each organization participating, including air transportation stakeholders.

- Coordinate with all air transportation stakeholders that operate in your jurisdiction (airlines, airports, federal agency partners, and other aviation businesses such as Fixed Base Operators and charter operators) to ensure clear and consistent implementation. Coordinate no less than 48 hours before implementation of the quarantine or restriction procedures. Objectives when coordinating and issuing guidance to stakeholders can include:
    - Ensuring there is a clear understanding of expectations and roles and responsibilities between the government implementing the measures and those air transportation entities that will be implementing any part of those requirements.

- - Encouraging the provision of pre-boarding/departure notifications to reduce stress to passengers and disruptions onboard the aircraft that may impair the safety or efficiency of the national airspace system.
  - Enabling air carriers to brief aircraft crews on what is expected of them prior to departure, during the flight, and upon arrival.

- Consider the logistics of how your government will collect information and perform screening, in consultation with air transportation operators and with a goal of minimizing burden and maximizing flexibility for operations:
  - Determine when and who distributes and collects passenger information forms.
  - The exact process for distribution and collection of forms in each airport may be different due to terminal size and configuration, but could include distribution on the aircraft, in the jetway, or at the departure gate.
  - Ensure departure and arrival guidance and any passenger information forms are consistent and repeatable. Carriers operate in multiple states. Different forms in each location will pose an issue for both airports and airlines.
  - Clearly delineate responsibility for managing and performing screening.
  - Minimize undesirable queueing or the formation of large groups of passengers.
  - Identify compliance and enforcement processes and jurisdiction.

- Proposed measures cannot close a Federally-obligated airport absent prior FAA authorization, and must consider all essential aeronautical services. These may include:
  - Scheduled or unscheduled passenger and cargo operations, to include charter and corporate aviation activities as well as private charitable efforts through volunteer pilot organizations;
  - Law enforcement needs, including local, state, and Federal public safety missions;
  - Department of Defense operations;
  - Medical services flights;
  - Aircraft maintenance/repair;
  - Flight support (i.e., fuel, other servicing, parking);
  - Operational flight functions performed by flight crews, mechanics, and ramp personnel; and
  - Air traffic control functions and personnel.

*This guidance is not legally binding in its own right and will not be relied upon by the FAA as a separate basis for affirmative enforcement action or other administrative penalty. Conformity with this guidance, as distinct from existing statutes, regulations, and grant assurances, is voluntary only, and nonconformity will not affect existing rights and obligations.*