1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SEAPLANE ADVENTURES,

          Plaintiff,

    v.

COUNTY OF MARIN, CALIFORNIA,

          Defendant.

No.  C 20–06222 WHA

**ORDER GRANTING
SUMMARY JUDGMENT
FOR DEFENDANT AND
AGAINST PLANTIFF ON
EQUAL PROTECTION AND
SECTION 1983 CLAIMS**

## INTRODUCTION

In this constitutional case brought by a seaplane operator for enforcement of a COVID-19 health order against it, defendant county moves for summary judgment. For the reasons that follow, summary judgment is **GRANTED** for defendant and against plaintiff on the equal protection and Section 1983 claims.

## STATEMENT

This civil action arises out of the COVID-19 pandemic. In essence, plaintiff seaplane operator, Seaplane Adventures, LLC ("Seaplane"), claims that Marin County shut it down using a health order allegedly preempted by federal aviation law and in violation of its constitutional rights.

**1.**     **THE COUNTY'S RESPONSE TO THE COVID-19 PANDEMIC.**

Seeking to slow the spread of COVID-19, the County enacted a public health order that hurt or destroyed many businesses but allowed "essential" businesses, including transportation

services, to remain open subject to certain restrictions.  The County's COVID-19 response was driven in large part by the County's public health officer, Dr. Matthew Willis, based on his knowledge of communicable diseases, consideration of guidance from the CDC and state government, and his collaboration with other County staff in a COVID-19 working group.  The County's health order attempted to reduce transmission by limiting the number of people leaving their home and interacting with others, reducing the intensity and duration of high-risk contacts, and requiring mitigation measures by businesses (Dkt. 55-7, Willis Decl. ¶ 5).

Under two versions of the health order, one enacted in March 2020 and the other in May 2020, "Essential Businesses" included (Dkt. 55-7, Exhs. 1 at 5–7; 2):

> Airlines . . . providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order.

"Essential Activities" included tasks required for health and safety purposes, obtaining necessary supplies or services, engaging in outdoor activities (with additional limitations), going to work, caring for family members, etc. (Dkt. 55-7, Exhs. 1 at 3–4, 2 at 4–5).  Both versions of the health order made a violation of their requirements a misdemeanor punishable by fine, imprisonment, or both (Dkt. 55-7, Exhs. 1 at 1; 2 at 1).

During May 2020, the County's health order allowed some businesses to reopen in phases based on community transmission rates, the capacity of the local health system, the success of COVID-19 testing and tracing efforts, etc. (Dkt. 55-7, Willis Decl. ¶¶ 7–9).  Limitations on businesses also considered "how essential the industry at issue was to the health and welfare of the community in general" and the transmission risk associated with certain activities (Dkt. 55-7, Willis Decl. ¶ 8).  Even permitted businesses remained subject to mask and social distancing requirements (Dkt. 55-7, Willis Decl. ¶ 9).  As of June 5, 2020, certain activities (outdoor religious services for groups under 100, charter boat operations, and limited use of pools and dog parks) could resume in line with site-specific protection plans (Dkt. 55-7, Willis Decl. ¶ 10).  Each business needed to submit an individualized site-specific protection plan that set out the precautions the business would take to prevent the spread of COVID-19, such as requiring social

2

United States District Court
Northern District of California

distancing, limiting capacity, and sanitizing procedures.  Site-specific protection plans had to be approved by the County.

To coordinate pandemic response efforts, the County created a COVID-19 working group composed of Dr. Willis and other County employees.  The working group publicized the health order on County website, on another separate website created by the County for COVID-19 information, and through outreach to towns and community partners (such as the Chamber of Commerce) (Dkt. 55-7, Willis Decl. ¶ 14).  Because the County lacked the resources to actively monitor all businesses, the County relied on circulating the health order, good-faith compliance by businesses, outreach to noncompliant businesses, and reports of violations (Dkt. 55-7, Willis. Decl. ¶¶ 16–17).

In responding to clear violations, County employees would inform the business of the health order and follow up to ensure compliance or report the violation to local law enforcement. Violations that required interpreting the health order were referred to the County's COVID-19 working group for discussion before deciding whether there was a true violation (Dkt. 55-7, Willis Decl. ¶ 17).  A member of this group described the goal of the discussions as "trying to help businesses open in a safe way" (Dkt. 61-1, Korten Tr. 64:6–7).

### 2.    ENFORCEMENT AGAINST SEAPLANE.

Seaplane offered a variety of services out of a privately-owned airport in Marin County, but relied primarily on sightseeing tours to stay afloat.  Seaplane possessed FAA certifications that allowed it to provide charter flight services (Part 135 certification) and flights that took off, stayed within 25 miles from the takeoff location, and landed back at the takeoff location (Part 91 certification).  Despite believing that as an "airline" no County-issued public health order applied to it, Seaplane voluntarily closed in mid-March 2020.  Seaplane "did not reopen until June 5, 2020 — the same weekend that Marin County amended the Health Order to allow indoor retail and boat charters" (Dkt. 55-7, Exh. 5; Dkt. 55-4, Exh. 10, Singer Tr. 91:23–25).

On June 11, 2020, however, Sheriff Sergeant Brenton Schneider emailed the owner of Seaplane, Aaron Singer, stating that he had called asking to book a flight and was told by an employee that Seaplane would be flying on weekends.  Sergeant Schneider explained that

1   Seaplane "[did] not fall under allowed business operations during the Shelter-in-Place Order"

2   and that the County had received "a multitude of complaints regarding [Seaplane's] business

3   being open" (Dkt. 55-6 at 4).  The email told Seaplane to "cease any operations related to

4   commercial sightseeing flights" (Dkt. 55-6, Exh. 12 at 4).

5          Seaplane responded on June 12, 2020, denying that the order applied to it in the first place

6   and explaining that Seaplane's Federal Aviation Administration certifications made it an

7   essential business under the health order.  Seaplane also answered that its airport fell under the

8   charter boat and outdoor activity exceptions enacted in early June because seaplanes were marine

9   vessels according to the United States Coast Guard and because Seaplane's operations took place

10  outdoors.  Seaplane also claimed that the reopening of all interior retail stores as of mid-June

11  should apply to it too.  Seaplane further defended its operations by stating that it had

12  implemented a COVID-19 site-specific protection plan as required by the County's Health

13  Department and the United States Centers for Disease Control.  (The County, however, had

14  never approved any site-specific protection plan for Seaplane's operations (Dkt. 55-6, Exh. 12 at

15  3).)

16         On June 15, 2020, Sergeant Schneider replied that, based on review by County staff, the

17  County's position remained that Seaplane's sightseeing operations were "a clear violation of the

18  current order" because "seaplane scenic tours and/or leisure travel services are not expressly

19  called-out [sic] as an allowed 'additional business' under the June 5 modification."  The email

20  explained that Seaplane could offer flights for "limited, authorized travel purposes" such as

21  "flights that allow for 'essential travel'" as set out in the health order (Dkt. 55-6, Exh. 12 at 1).

22  Sergeant Schneider also explained that differing policies for charter boats and outdoor activities

23  had to do with passengers of a seaplane occupying a confined space.  Being inside the cabin of a

24  seaplane, he noted, could not be considered being "outdoors" even if the aircraft windows stayed

25  open (Dkt. 55-6, Exh. 12 at 2).  Finally, in response to Singer's observation that indoor retail had

26  reopened, Sergeant Schneider pointed out that sightseeing tours are not "indoor retail."

27

28

4

United States District Court
Northern District of California

On June 28, 2020, a County staff member received an email complaining about Seaplane and San Francisco Helicopters both "operating tourist sightseeing flights." The reporting individual made no mention of noise from either business, stating instead (Dkt. 61-1, Exh. 21):

> What does it say about a county government that mandates continued closure of faith-based indoor services for the local community and yet refuses to enforce the order against a seaplane business that provides sightseeing flights to non-resident tourists, despite warnings from the Sheriff and the County Council [sic] that they are violating the COVID-19 order? The Sheriff and Supervisors were alerted to this violation nearly three weeks ago and yet there has been no enforcement

> Apparently in Marin it's now OK to take a sightseeing ride inside a seaplane or helicopter with no social distancing possible, but I can't worship inside my church. WOW!

The email provided no further details about how the individual learned of the violation or whether the report from three weeks ago came from this same person.

On July 3, 2020, a County law enforcement officer visited Seaplane's place of business. The officer told Singer, "I've been directed to come down and inform you, as per the emails you [and the County] have been exchanging back and forth, that if you do take off with passengers on — on your flight plans or whatever you have for your tours and whatnot, that each time you land, you will be cited" (Dkt. 55-2, Tr. 8:13–18). The officer confirmed that Singer was aware of the emails at the time of the visit (Dkt. 55-2, Tr. 12:1–8). He warned Singer that continued recreational flights could result in a $1000 fine per flight. Though the officer did not refer to any complaints about Seaplane, Singer told the officer "I don't understand why we're getting picked on except for there's complainers over here that have a lot of money" (Dkt. 55-2, Tr. 13:12–14).

Singer testified during his deposition that, on July 4, 2020, he had received a call from the Sheriff's Office stating that they believed that Seaplane had a booking to fly a group of customers posing as family members. The officer, Singer claims, threatened to visit Seaplane to interview the customers as they deboarded the airplane (Dkt. 55-4, Singer Dep. 116:12–25). Nothing in our record indicates what became of that threat.

1    Seaplane closed, Singer testified during his deposition, "under threat of extreme economic

2    penalty, and further threat that if I continued I would be arrested" (Dkt. 55-4, Singer Dep. 116:5–

3    7).  Singer did not state when and how this threat was made.  Despite being permitted to continue

4    to provide chartered passenger transport, flight instruction, and other non-recreational services,

5    plaintiff counsel contacted the County via email on July 10, 2020, to contest this so-called

6    "impermissible shutdown" (Dkt. 56-2, Exh. E).

7    In response, County counsel tried to "clarify" the "enforcement history" against Seaplane,

8    denying that it had been "shut down" or that its use permit has been revoked (Dkt. 56-2, Exh. E

9    at 1).  The email again supplied Seaplane with the order's definition of "essential travel" and

10   stated that "to the extent [Seaplane's] business provides flights for limited, authorized travel

11   purposes (i.e. not sightseeing or leisure travel to Lake Tahoe), [Seaplane] can provide passengers

12   with flights that allow for 'essential travel' under the [C]ounty's May 15, 2020 Shelter in place

13   order" (Dkt. 56-2, Exh. E at 2).  County counsel stated that sightseeing did not qualify as

14   "transportation services" under the health order because "patrons return to the same place they

15   took off from" (Dkt. 56-2, Exh. E at 3, 4).  While non-essential flights had to cease, the email

16   informed plaintiff's counsel that transportation services for essential activities could continue,

17   offering the example of flying healthcare workers, as opposed to vacationers, to Tahoe (Dkt. 56-

18   2, Exh. E at 3).  The email added that, as far as County counsel knew, Seaplane had never been

19   told that it could not offer any of the non-recreational services listed on Seaplane's website,

20   including "fire spotting; search and rescue; bay conservation research support; marine

21   conservation support; and emergency cargo transportation to remote locations" (Dkt. 56-2, Exh.

22   E at 3).

23   Seaplane alleges, nevertheless, that the County simply wanted to shut it down because its

24   airport caused persistent noise complaints from neighbors.  There is a history on this point.  A

25   2017 hearing held by the County Planning Commission considered Seaplane's land use permit

26   (Dkt. 56-1, Exh. D).  According to Singer, this hearing came about because neighboring

27   homeowners sought to revoke or limit Seaplane's land use permit due to the noise caused by its

28   aircraft (Dkt. 56-3, Singer Decl. ¶ 23).  Singer testified that the hearing involved over 250

United States District Court
Northern District of California

people, that dozens of public citizens spoke at the hearing, and that the majority of them expressed support for Seaplane (Dkt. 56-3, Singer Decl. ¶ 23).  At the conclusion of the hearing, the Planning Commission found that Seaplane had not violated its use permit, that certain noise-related limitations of the use permit should be revoked, and federal regulation of aircraft noise preempted the County's ability to place noise-related restrictions on Seaplane's use permit (Dkt. 56-1, Exh. D at 2–3).  The Planning Commission's 2017 findings stated (Dkt. 56-1, Exh. D at 3):

> Presumably unknown to the Planning Commission at the time they modified the Use Permit in 1981, the US Supreme Court had in 1973 issued a ruling . . . that prohibited local jurisdictions from regulating aircraft noise, viewing it as an element of aviation regulation that was left exclusively to the authority of the Federal Government . . . the other operational restrictions related to take offs and landings may be difficult to enforce because local regulation is preempted by Federal law.

Seaplane claims, nevertheless, that the neighbors and the County used the pandemic as a way to shut down Seaplane for being too noisy.

### 3.   ENFORCEMENT AGAINST OTHER AIR CARRIERS.

According to the County's public health officer, Dr. Willis, only two aircraft-related businesses beside Seaplane were ever considered in relation to the health order — Skydive Golden Gate, a skydiving business operating out of Gnoss Field (an airport located in Novato and owned by the County), and San Francisco Helicopters, a helicopter tour business operating out of the same facility used by Seaplane (Dkt. 55-7, Willis Decl. ¶ 19).  Dr. Willis testifies that the County's COVID-19 working group discussed the applicability of the health order restrictions to Skydive Golden Gate, San Francisco Helicopters, and Seaplane during June 2020 and determined that the health order restricted the operations of all three businesses (Dkt. 55-7, Willis Decl. ¶ 19).  Enforcement related to these other two operators is as follows.

On May 28, 2020, the owner of Skydive Golden Gate reached out to the County to ask whether it could resume operations under the health order, as certain other Bay-area skydiving operations had been allowed to reopen as flight training operations (an essential business).  In its response dated June 3, 2020, a County staff member told Skydive Golden Gate that it could resume operations as a business offering outdoor recreation activity.  One week later, however,

the County retracted this statement, explaining that "both County Counsel and our Public Health Director have determined that skydiving businesses are not able to operate under the County's outdoor business guidelines, nor under any other of the Public Health Order allowances" (Dkt. 55-1, Brady Decl., Exh. 8 at 3).  The County's response further explained to Skydive Golden Gate that non-recreational transportation was allowed (Dkt. 55-1, Brady Decl., Exh. 8 at 3).  On June 19, Skydive Golden Gate's owner sent the County another email stating that Seaplane had been operating and that limiting skydiving operations would be "overtly hypocritical and blatantly discriminatory against skydiving" (Dkt. 55-1, Brady Decl., Exh. 8 at 2).  County staff responded that "Seaplane . . . ha[d] also been instructed to cease operations related to recreational activities" (Dkt. 55-1, Brady Decl., Exh. 8 at 1).

On July 2, 2020, County law enforcement visited Seaplane's place of business looking for Seaplane's owner to ensure compliance with the health order.  Upon arrival, the officers encountered Ron Carter, a helicopter pilot employed by San Francisco Helicopters, a skydiving business that rented a helicopter pad from Seaplane.  An officer stated that "if [the business was] taking passengers on a tourist trip . . . not, in other words, transporting them to another location" then those operations were "not essential travel" and would constitute "a violation of the health order" that could result in a per-flight fine (Dkt. 55-2, Tr. 13:25–14:11).  The reasoning behind the enforcement was further explained as preventing "people [from] sitting next to each other in an . . . enclosed space" (Dkt. 55-2, Tr. 9:3–5).  Though the officers did not state the source of any report (other than being directed to enforce the order by County counsel), Carter stated San Francisco Helicopter "got an email from the guy over there at Strawberry Point," that the report probably came from this person, and that he was "constant complainer" (Dkt. 55-2, Tr. 5:20–6:3).  One officer denied knowing who initially submitted a report about a potential violation (Dkt. 55-2, Tr. 15:23–16:3).

Our record does not reflect that any further enforcement action was taken against either Skydive Golden Gate or San Francisco Helicopter after communicating the terms of the health order (Dkt. 55-7, Willis Decl. ¶ 19).  Neither side offers additional evidence of enforcement attempts against other air carriers.  The County-employed airport manager, Daniel Jensen,

testified that he was aware of the health order's limitations on non-essential activities and received no reports of any health order violations by air carriers operating out of Gnoss Field. Jensen declared under oath that, to his knowledge, all businesses at Gnoss Field complied with the health order (Dkt. 55-5, Jensen Decl. at ¶ 5).

\*           \*           \*

The complaint alleged multiple constitutional claims —preemption of the health order by federal aviation law, violation of due process, violation of equal protection, a Section 1983 claim, and an unconstitutional taking — however a prior ruling dismissed all but the preemption issue and claims deriving from plaintiff's equal protection theory (Dkt. 36).

The order on this motion follows full briefing and oral argument.

## ANALYSIS

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Material facts are those that might affect the outcome of the case under the governing, substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Rule 56 does not require the moving party to negate its opponent's claims but only show that the evidence has failed to amount to a genuine issue of material fact. *Ibid*. If the moving party can meet this burden of production, then the nonmoving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Ibid*. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256. If the nonmoving party fails to show that there is a genuine issue of material fact, the moving party's motion for summary judgment should be granted. *See Celotex Corp.*, 477 U.S. at 323.

United States District Court
Northern District of California

9

1

### 1.    PREEMPTION.

The judge requested that the Federal Aviation Administration weigh in on the preemption question, but the agency declined to do so because the challenged health order was no longer in effect (though it did provide proof of Seaplane's FAA certifications) (Dkt. 43).  The judge issued an order to show cause and will decide the federal preemption issue in due course.

Seaplane also offers a pseudo-preemption argument based on an order and associated guidance from the State of California which, it argues, defines "sea plane bases" as "essential critical infrastructure" and therefore allowed Seaplane to stay open despite the health orders (RJN, Exh. A at 10; Opp. at 18–19).  This argument fails for two reasons.  *First*, what Seaplane points to, a document dated April 28, 2020, and entitled "Essential Workforce," does not state that local governments may not place limits on the listed categories of businesses.  Instead, the document states (RJN, Exh. A at 1):

> In accordance with [Executive Order N-33-20], the State Public
> Health Officer has designated the following list of  "Essential
> Critical Infrastructure Workers" to help state, local, tribal, and
> industry partners as they work to protect communities, while
> ensuring continuity of functions critical to public health and safety,
> as well as economic and national security.

Of the critical infrastructure sectors, the "Transportation and Logistics" category included "sea plane bases" (RJN, Exh. A at 10).

The order to which this document refers, Executive Order N-33-20, issued by Governor Gavin Newson on March 19, 2020, states:

> To protect public health, I as State Public Health Officer and
> Director of the California Department of Public Health order all
> individuals living in the State of California to stay home or at their
> place of residence except as needed to maintain continuity of
> operations of the federal critical infrastructure sectors . . . .
>
> [. . .]
>
> The federal government has identified 16 critical infrastructure
> sectors whose assets, systems, and networks, whether physical or
> virtual, are considered so vital to the United States . . . .  I order
> that Californians working in these 16 critical infrastructure sectors
> may continue their work because of the importance of these sectors
> to Californians' health and well-being.

United States District Court
Northern District of California

10

The health order associated with the list of critical sectors (including "sea plane bases"), therefore, requires that individuals not leave their residence except to maintain the continuity of operations in these sectors. This would preclude carrying on non-essential operations not related to supporting part of the critical infrastructure. Thus, neither the order nor the accompanying list of "critical" sectors prohibited local governments from placing restrictions on recreational operations of the listed sectors. The County followed state guidance because Seaplane was never shut down and its essential operations (transport for essential activities, emergency cargo transport, etc.) were never restricted.

### 2. EQUAL PROTECTION.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). A plaintiff can establish an equal protection "class of one" claim by demonstrating that the state actor (1) intentionally (2) treated him differently than other similarly situated persons, (3) without a rational basis for the difference in treatment. *Gerhart v. Lake County Montana*, 637 F.3d 1013, 1020 (9th Cir. 2011); see also *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The we must identify the relevant group of similarly-situated entities. "The group[] must be comprised of similarly situated persons [or entities] so that the factor motivating the alleged discrimination can be identified . . . . While the group members may differ in some respects, they must be similar in the respects pertinent to the State's policy." *Taylor v. San Diego Cty*., 800 F.3d 1164, 1169 (9th Cir. 2015) (citations and quotations omitted). The County contends that "indoor recreation" (sightseeing) or "recreational travel businesses" (recreational charter for non-essential travel) offer relevant comparators. Seaplane argues that its FAA certification says nothing about "recreation" and that it is comparable to other air carriers with the same type of FAA certifications (Part 135 and Part 91) that were operating out of Gnoss Field. Seaplane also suggests that the same policy that applied to charter boats should apply to it too.

11

United States District Court
Northern District of California

1    FAA certifications and vessel types (seaplane versus helicopter versus charter boat),

2    however, were not pertinent to the parameters of the health order.  Prohibitions on certain

3    business operations considered the industry or purpose of the business, transmission risk (indoor

4    versus outdoor, ability to social distance, etc.), and importance to the community (essential

5    versus non-essential or recreational).  This order finds, therefore, that similarly-situated

6    businesses were other air carriers providing recreational flights, regardless of aircraft or

7    certification type.  While the difference in transmission risk could vary between airplanes,

8    seaplanes, and helicopters, they are highly similar to one another.  The similarity cannot be

9    ignored when comparing aviation businesses (which required passengers to sit in a confined

10   space with little to no ability to social distance depending on the size of the aircraft) to indoor

11   businesses such as retail shopping or outdoor operations such as patio dining or chartering boats.

12   "Similarly situated" should also take into account that the health order only prohibited

13   recreational aviation activities and allowed transportation for essential activities and essential

14   services to continue.

15       "The rational basis prong of a 'class of one' claim turns on whether there is a rational basis

16   for the distinction, rather than the underlying government action." *Gerhart v. Lake Cty. Mont.*,

17   637 F.3d 1013, 1023 (9th Cir. 2010).  Here, the distinction between recreational and non-

18   recreational aviation rested on a rational basis.  The goal of preserving critical infrastructure for

19   essential activities (*e.g.*, transporting healthcare workers or those traveling to care for a family

20   member) outweighed the increased risk of COVID-19 transmission.  The same went for critical

21   aviation support operations like flight instruction, cargo transport, or fuel services.  On the other

22   hand, when passengers booked flights just for fun, no countervailing benefit outweighed the risk

23   of viral transmission.

24       As a matter of law, Seaplane has failed to offer enough material evidence to demonstrate

25   an issue of material fact that the County treated it differently than any other similarly-situated

26   businesses that failed to comply with the health order.  To the contrary, the undisputed evidence

27   shows that the County followed a rational approach to Seaplane as it did with other businesses

28   seeking to offer recreational aviation operations.

United States District Court
Northern District of California

1     On July 2, 2020, law enforcement officers warned San Francisco Helicopter's pilot, Ron

2  Carter, about potential fines if the helicopter "[took] passengers on a tourist trip . . . not, in other

3  words, transporting them to another location." (Dkt. 55-2, Tr. 13:25–14:11).  In Skydive Golden

4  Gate's case, the County learned that the business sought to *resume* recreational operations when

5  the owner reached out and asked permission to do so.  Despite some initial confusion, Skydive

6  Golden Gate was told that "skydiving businesses [were] not able to operate under the County's

7  outdoor business guidelines. . . ." (Dkt. 55-1, Brady Decl., Exh. 8).

8     In Seaplane's case, the County learned of Seaplane's noncompliance based on multiple

9  reports and confirmed that noncompliance at least once by calling Seaplane to ask if they were

10  flying.  As a result, the owner received multiple warnings, including emails, a call, and an in-

11  person visit by law enforcement during which an officer explained that recreational flights could

12  result in a $1,000 fine per flight (though no fines were ever imposed).  These communications

13  conveyed that transportation for essential activities and non-recreational operations could

14  continue.  Unlike other businesses, Singer says he was threatened with arrest (though he never

15  specified how or when this threat was made or by whom).  A warning that Singer could be

16  arrested would be a rational next step given Seaplane's repeated refusal to comply with the

17  health order.  The text of the health order also warned that failure to comply was a misdemeanor

18  punishable by both fines and imprisonment (Dkt. 55-7, Exh. 1 at 1; Exh 2 at 1).

19

20                              *              *              *

21     The County has shown the rationality of the order's recreational-versus-essential

22  distinction and its application to Seaplane, so Seaplane must show a remaining issue of material

23  fact that would warrant denial of summary judgment.  It cannot do so.

24     In support of its discrimination claim, Seaplane insists that the County treated other air

25  carriers operating out of Gnoss Field differently because they were allowed to continue

26  operating.  This argument fails for three reasons.

27     *First*, Seaplane repeatedly ignores that the County never shut it down. Seaplane could

28  continue any operations other than purely recreational ones.

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Second*, Seaplane offers a mere sliver of evidence to create an issue of material fact that any air carriers violated the health order while the County looked the other way (Opp. at 4, 7–8). Though close calls are resolved in favor of the non-movant, the plaintiff must rely on more than bald or speculative assertions to survive summary judgment.  A close look at the declaration and deposition testimony leads invariably to the same conclusion:  the witnesses lacked personal knowledge of or failed to testify to any example of an air carrier that violated the health order yet escaped enforcement.  The evidence offered on this point follows.

A lessee of a hangar at Gnoss Field, Andrew Wait, provided a declaration stating that airlines at Gnoss Field "flew for all purposes, including 'recreation,'" and that "air carriers were fully operational for flight school, charter flights, takeoffs and landings" (Dkt. 56-4, Wait Decl. ¶ 3).  Wait's belief that *recreational* flights occurred was based on "the fact that [he] [knew] the owners [of air carrier businesses] . . .  and . . .  some of the pilots" and "they told [him] that they went for a flight" (though Wait never specifies whether the pilot said the flight was recreational or if Wait assumed this).  The declaration goes on to say that Wait "believe[d] that they were recreational flights because they took off and returned to the same airfield (Gnoss Field)," and that he "could not imagine another purpose for these flights" (Dkt. 56-4, Wait Decl. ¶¶ 3, 4, 6). Wait did not explain how he knew that these flights did not transport passengers before returning to Gnoss Field.  The operations that Wait attests to having personally observed were "flight schools" and "flight rental programs" (both allowable under the health order, as long as the flight rental was not for purely recreational purposes) (Dkt. 56-4, Wait Decl. ¶¶ 3, 4). While Wait acknowledges that he knows that the County enforced the health order against a skydiving business operating out of Gnoss Field, Wait's declaration says he "do[es] not consider [skydiving] 'aviation'" (Wait Decl. ¶ 4).  Wait further testified in his deposition that he was not aware of anyone reporting a violation of the health order to the County between March and September 2020 nor was he "aware of how Seaplane was treated differently relative to other air travel companies that operate out of the County" (Wait Dep. 53:24–54:5, 61:9–13).

Patrick Scanlon, the owner of Scanlon Aviation, stated his business "operated for all purposes it was/is permitted to under [its] Part 135 [certification]" including "booking and flying

14

charter flights throughout the state and flight instruction for recreational purposes or otherwise" and that the County never told him to limit his operations (Dkt. 56-5, Scanlon Decl. ¶¶ 4, 7–8; Exh. A).  The declaration did not clarify whether Scanlon Aviation provided recreational sightseeing flights or charter services for leisure travel while the health order was in effect.  The implication of Scanlon's testimony is that he *may* have offered flight instruction to passengers taking the lessons for recreational purposes. (Though the County never prohibited flight lessons.) Depending on how Scanlon's testimony is read, it could also suggest that he offered charter flights that *may* have transported passengers for leisure travel.  No further testimony exists to clarify the ambiguity because the County never deposed Scanlon.

Scanlon further claims that "the County knew that [Scanlon Aviation] was not limiting [its] operations in any way pursuant to the Health Order[], other than as outline[d] in [its] Site[-]Specific Protection Plan," its County-approved plan for COVID-19 safety procedures.  Scanlon offered no evidence that the County would have known that his business offered recreational activities (Scanlon Decl. ¶ 8).  The site-specific protection plan referred only to "flight instruction" and "air charter."  It never mentioned that Scanlon Aviation planned to offer flights for purely recreational purposes (Scanlon Decl., Exh. A).

Singer testified in his sworn declaration and during deposition that he observed aircraft flying in and out of Gnoss Field (as he regularly used a hangar there).  He also stated that he reviewed advertisements by other businesses operating out of Gnoss Field (Dkt. 55-4, Singer Dep. 244:5–17).  He claims flights were conducted by Aeroclub Marin, Scanlon Aviation, CB Skyshare, Surf Air, and San Francisco Helicopter (Dkt. 55-4, Singer Dep. 242:10–17; 266:4–11). Singer stated that, to his knowledge, several of these air carriers provided charter flights and flight instruction during the period when the health order was in effect (Dkt. 55-4, Singer Dep. 259:4–22; 260:6–261:2).  Singer testified that he did not specifically know the reasons for these flights, the motivations of the passengers, or where the flights were headed (Singer Dep. 254:2–256:13; 258:5–15; 260:24–261:20).  When asked during deposition if he was "aware of any evidence that any other business in Marin County [beside Seaplane] violated any terms of the

health order[] between . . . March and September 2020," Singer stated "I am not." (Exh. 22, Singer Dep. 21:22–22:1).

The closest this evidence comes to establishing an issue of material fact is vague hearsay offered by Wait and Scanlon's statements that Scanlon Aviation took a business-as-usual approach to its offerings (even though it implemented mitigation measures in line with a County-approved site-specific protection plan). The declarations offer a prime example of carefully-crafted, attorney-driven testimony, but lack the substance to establish an issue of material fact as to other violators.

*Third*, and more importantly, Seaplane offers no evidence that the County *knew* about any violations other than those it took enforcement action against. San Francisco Helicopter was the only other aviation business that the County had reason to believe was violating the health order (based on an email that also reported Seaplane) (Dkt. 55-2, Tr. 13:25–14:11; Dkt. 55-7, Willis Decl. ¶ 19; Dkt. 61-1, Exh. 21). Skydive Golden Gate, the other aviation business the County communicated with about the health order, sought permission to reopen. It was not reported as noncompliant (Dkt. 55-1, Brady Decl., Exh. 8).

Though the County offers two emails reporting Seaplane to the County, Seaplane offers no similar reports against other air carriers that the County then treated more leniently. Seaplane contends that the County had knowledge of any and all violations at Gnoss Field because the County owned the airport. This is too far a logical leap. The County-employed manager of Gnoss Field provides sworn testimony that he received no reports nor had any other knowledge of violations at Gnoss Field. His presence at Gnoss Field, even assuming he observed aircraft taking off and landing, does not show that the County knew the purpose of the flights or the intentions of their passengers. Plaintiff has failed to raise any dispute of material fact that, if resolved, would lead to the conclusion that the County knew about other violators but treated them differently without a rational basis. This point carries far more weight than whether there were in fact other violators.

Nevertheless, this order pauses to consider plaintiff's theory of discriminatory intent. Seaplane contends that noise-annoyed neighbors worked with the County to shut it down.

16

United States District Court
Northern District of California

1  Seaplane points to the 2017 planning commission hearing in which neighbors complained about

2  the noise caused by Seaplane's aircraft.  After that hearing, however, the County sided *with*

3  Seaplane, even eliminating noise-related restrictions on Seaplane's use permit.  The only

4  evidence that the enforcement by the County had anything to do with Seaplane's neighbors were

5  statements by Singer, Seaplane's owner, and San Francisco Helicopter's pilot that the County's

6  enforcement must have something to do with their neighbors.

7      Blaming enforcement on reports by neighbors cannot save the equal protection claim (Dkt.

8  61-1, Exh. 21).  On June 19, 2020, the owner of Skydive Golden Gate emailed the County

9  complaining that it was hypocritical that Seaplane could continue operating while he had been

10  told that his skydiving business could not reopen (Dkt. 55-1, Brady Decl., Exh. 8 at 2).  Another

11  email protested that Seaplane should not be open while churches had to stay closed (Dkt. 61-1,

12  Exh. 21).  Even if these individuals reported Seaplane because of noise (rather than being upset

13  about inconsistent enforcement) the motivations of those who tipped off the County are

14  irrelevant to equal protection.  Only *the County's* motivation for enforcement matters.  Seaplane

15  offers no evidence that a County agent had an improper motive for applying the health order to

16  Seaplane.  If anything, it would have been irrational for the County *not* to enforce the order

17  against Seaplane after receiving reports of its noncompliance.

18      As a matter of law, the County's health order was rational.  So too was its application to

19  Seaplane.  Plaintiff points to no remaining factual question that casts doubt on these conclusions.

20  Undisputed facts lead inevitably to the finding that the County acted fairly and with a rational

21  basis when it prohibited Seaplane's recreational operations in an effort to slow the spread of a

22  deadly virus.  The equal protection claim warrants dismissal.

23      **3.    SECTION 1983**

24      Plaintiff's Section 1983 claim survived the County's motion to dismiss to the extent it

25  could be derived from the alleged equal protection violation.  However, plaintiff's equal

26  protection claim fails and no route to the Section 1983 claim remains.  This claim is therefore

27  dismissed.

28

United States District Court
Northern District of California

### 4.    WITNESS DESIGNATION AND TESTIMONY.

Seaplane raises a variety of complaints about witnesses in this case but this order dismisses each in turn.

Seaplane objects to the use of testimony by Dr. Willis, the County's public health officer, because the County did not designate him as the person most knowledgeable about the County's health order.  Instead, the County designated  Max Korten, the Director of Marin County Parks and the General Manager of the Marin County Open Space District.  Seaplane had the opportunity to depose both witnesses and it provides no argument why the designation of Korten rather than Dr. Willis prejudiced it in any way.

Seaplane objects to the testimony of Dr. Willis "to the extent that [he] provides an expert opinion" because he was not designated as an expert witness.  While Dr. Willis's declaration does reference scientific and medical evidence, his testimony serves to explain the process used by the County to develop and enforce the health order.  Dr. Willis bases this testimony on his personal observations and involvement in the County's COVID-19 working group.  Dr. Willis offered no opinion about the scientific or medical legitimacy of the health order (nor any other matter).  No expert designation was required for Dr. Willis's testimony to be considered.

Seaplane points out that the declarations of Dr. Willis and Dan Jensen include statements beginning with "I understand that . . . ." or referencing the witnesses' "understanding" without providing further foundation for the basis of that understanding.  Seaplane argues that these statements should be stricken from the record under Civil Local Rule 7-5(b), which provides:

> An affidavit or declaration may contain only facts, must conform as much as possible to the requirements of Fed. R. Civ. P. 56(e), and must avoid conclusions and argument.  Any statement made upon information or belief must specify the basis therefor.  An affidavit or declaration not in compliance with this rule may be stricken in whole or in part.

This order agrees that our record is sprinkled with statements too conclusory or speculative to be properly considered.  Statements unsupported by substantive facts have not been considered in arriving at this ruling.

18

### 5.   ATTORNEY-CLIENT PRIVILEGE

Plaintiff alleges that the County improperly withheld documents on the basis of attorney-client privilege, pointing to a privilege log from County counsel dated June 30, 2021 (Dkt. 61-1, Exh. 21-A).  Seaplane states in its opposition to summary judgment that it will elicit this improperly withheld evidence with a motion in limine before trial.  Seaplane further claims that it will offer this evidence to prove that the County had "meetings and communications with persons and entities seeking to shut down Seaplane for . . .  reasons unrelated to the pandemic" (Opp. at 24).

The discovery deadline was July 30, 2021 (Dkt. 48).  According to Local Rule 37-3, "no motions to compel discovery may be filed more than 7 days after the discovery cut-off."  Despite receiving the privilege log a full month before the discovery cut-off, Seaplane never tried to seek relief for any allegedly improper withholding.  It cannot now establish the theoretical possibility of an issue of material fact by disputing a withholding it failed to challenge at the appropriate time.  This order therefore disregards the conclusory assertion that evidence outside our record would establish an issue of material fact.

### CONCLUSION

For the foregoing reasons, summary judgment is **GRANTED** in favor of the County and against Seaplane on the equal protection and Section 1983 claims.

**IT IS SO ORDERED.**

Dated:  November 5, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE