UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SEAPLANE ADVENTURES, LLC,

    Plaintiff,

  v.

COUNTY OF MARIN, CALIFORNIA,

    Defendant.

No. C 20-06222 WHA

**ORDER RE PREEMPTION AND RELATED RELIEF**

This order decides the preemption question raised by Seaplane's challenge to the County of Marin's COVID-19 health order. A prior order granted summary judgment for the County on Seaplane's equal protection and related Section 1983 claim. A full explanation of the facts underlying this litigation can be found in that order (Dkt. 70). The key facts for the preemption analysis are simple: the County only prohibited two of Seaplane's various operations, namely, recreational sightseeing flights and flights chartered for leisure travel. The health order did not prohibit Seaplane from offering transportation for essential activities or other operations such as fire spotting and cargo transport.

The County's motion for summary judgment did not extensively brief the preemption issue. Seaplane did not make a cross motion for summary judgment nor did it rely directly on a preemption argument in its opposition to summary judgment (though it did repeatedly reference its Federal Aviation Administration certificates). Nevertheless, the preemption issue warrants addressing.

United States District Court
Northern District of California

An order requested that the FAA weigh in on the preemption question (Dkt. 35). The agency declined to do so, it said, because the challenged health order was no longer in effect, mooting the issue (though it did provide proof of Seaplane's FAA certificates) (Dkt. 43). So, we were left to decide the issue without the benefit of the FAA.

After the FAA's response, an order asked the parties to explain whether the preemption issue was, in their view, moot (Dkt. 46). The County agreed with the FAA, citing *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019), for the premise that "the repeal, amendment, or expiration of legislation will render an action challenging the legislation moot, unless there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it" (Dkt. 49 at 2–3). The County contended that improving circumstances have decreased the need for future COVID-19 restrictions, making it unlikely that the County will enact a similar health order. The County also asserted that Seaplane's preemption claim does not entitle it to any other form of relief beyond the allegedly-mooted request for declaratory relief (Dkt. 49 at 4).

Seaplane responded by arguing that there is a reasonable chance that the challenged health order will be reinstated in the future. In support of this contention, Seaplane pointed out that the County amended the challenged health order four times between March 2020 and June 2021, and that the evolving nature of the pandemic (and COVID-19 variants) makes it possible the health order will be reinstated (Dkt. 50 at 2–3).

The pandemic has involved multiple setbacks in the progress toward reopening. The Court, therefore, agreed that there exists a reasonable enough likelihood that the health order will be reinstated to warrant consideration of the preemption issue. Because the preemption issue was not adequately addressed in the summary judgment briefing, however, the parties were ordered to show cause why or why not Seaplane's preemption theory should be upheld (Dkt. 68).

In response to the order to show cause, the County argued that the preemption theory should be dismissed because the County retained its police power to prohibit certain types of flights and because neither implied field nor conflict preemption applied to the health order (Dkt. 71 at 2). The County added that even if federal law preempted the health order's aviation-related

restrictions, the only relief available to Seaplane would be injunctive or declaratory relief while damages would not be available (Dkt. 71 at 6).

Seaplane's response to the order to show cause not only repeated its preemption argument from the complaint but also added on the new argument that Seaplane is entitled to $1,000,000 in damages under Section 1983 because the County enforced a preempted health order against it (Dkt. 72 at 7). Seaplane acknowledged that no decision has specifically addressed preemption of aviation-related restrictions during a public health emergency but pointed to FAA guidance it found instructive (further discussed below) (Dkt. 72 at 2).

\* \* \*

Because the "Federal Aviation Act has no express preemption clause," plaintiff's preemption theories must allege either implied field preemption or conflict preemption. *See Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 808 (9th Cir. 2009). "The [Airline Deregulation Act], unlike the FAA, contains an express preemption provision." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 474 (9th Cir. 2007). To bring a facial preemption challenge, a plaintiff must still overcome the high bar set in *Salerno*: that "no set of circumstances exists under which the [health order] could be valid." *See Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

For the following reasons, federal aviation law does not preempt the County's restriction on sightseeing flights but does preempt its application to transportation services (regardless of passengers' reasons for traveling).

**1. CONFLICT PREEMPTION.**

Because conflict preemption inquiry narrows the field preemption inquiry, this order considers conflict preemption first.

Conflict preemption arises "where compliance with both federal and state regulations is a physical impossibility" and in "those instances where the challenged state law stands as an

3

obstacle to the objectives of Congress." *Ventress v. Japan Airlines*, 747 F.3d 716, 720–21 (9th Cir. 2014).

*First*, Seaplane pointed to no law which the health order forces it to violate. The health order did not interfere with Seaplane's ability to meet aviation safety standards or any other regulations. Prohibiting flights based on their being "recreational" would not make it physically impossible to comply with the health order under federal law because Seaplane had no obligation under federal law to provide the recreational flights prohibited by the health order.

*Second*, this order considers whether the challenged health order stood as an obstacle to the objectives of Congress and finds that it does, but in a much narrower sense than Seaplane contends.

Seaplane asserted that 49 United States Code Section 41713(b)(1) of the Airline Deregulation Act preempted the County's health order. Section 41713(b)(1) states:

> [A] State, political subdivision of a State, or political authority of at least [two] States may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to* a *price, route, or service* of an air carrier that *may provide air transportation* under this subpart.

(emphasis added). Seaplane has an air carrier certificate and is registered with the Office of the Secretary of Transportation as an air taxi operator, both of which allowed it to "provide air transportation" (Dkts. 43-1, Temprosa Decl. ¶ 2; 43-2, Thorpe Decl. ¶ 2, Exh. A). Section 40101 of the Act defines "air transportation" as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft." Though our record does not suggest that Seaplane actually flew to other states or countries, its certificates allowed it to do so. Because Seaplane falls into the category of aircraft that "*may* provide air transportation," Section 41713(b)(1) applies to it.

The Supreme Court has held that the key language of Section 41713(b)(1), "related to," "express[es] a broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). But "[i]f a state law's effect on price, route or service is too tenuous, remote, or peripheral, then the state law is not preempted." *Air Transp. Ass'n of Am. v. City & Cty. of San*

4

*Francisco*, 266 F.3d 1064, 1070 (9th Cir. 2001); *see also*, *Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1141 (9th Cir. 2021) ("[B]ackground regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted."). In *Air Transport Association of America*, our court of appeals explained the terms "related to" and "price, route, or service" as follows:

> [A] state or local law is "related to" a price, route or service if it has a connection with, or reference to a price, route, or service. We have held that the terms "price," "route" and "service" were used by Congress in the public utility sense; that is, service refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided. Airlines' "rates" and "routes" generally refer to the point-to-point transport of passengers. "Rates" indicates price; "routes" refers to courses of travel.

266 F.3d at 1070 (quotations omitted).

In light of *Air Transport Association of America*, this order finds Section 41713(b)(1) does not apply to Seaplane's recreational sightseeing flights because these operations are not "a price, route, or service" as contemplated by Section 41713(b)(1). Recreational sightseeing is not a "public utility." Passengers on sightseeing flights leave from and return to the same spot, so there are no "markets to or from which transportation is provided." For the same reason, Seaplane's sightseeing flights do not count as a "course[] of travel." Section 41713(b)(1), therefore, does not preempt the County's health order insofar as it restricted sightseeing flights. This order can find no other law that the prohibition on sightseeing flights would conflict with either.

Though Section 41713(b)(1) does not preempt a restriction on *sightseeing*, we must still consider whether this section applies to the prohibition on charter flights for non-essential or recreational travel (because the health order allowed charter flights for essential travel to continue). A charter flight for non-essential travel, for example, would be a group of vacationers chartering a seaplane to be taken from Sausalito to Tahoe for a week of skiing. The County distinguished recreational charter flights from allowable flights for essential travel. An email

dated July 15, 2020, from County counsel to Seaplane's counsel explained (Dkt. 56-2, Sharp Decl., Exh. E at 2):

> [T]he Marin County Sheriff's Office issued a written warning to Mr. Singer on June 15, 2020. In that warning, the Sheriff's Office was clear that certain "essential travel" flights could continue under the order.
>
> Specifically, Sgt. Brenton Schneider explained, "to the extent your business provides flights for limited, authorized travel purposes (i.e. not sightseeing or leisure travel to Lake Tahoe), you can provide passengers with flights that allow for 'essential travel' under the County's May 15, 2020 Shelter in place order." . . . .
>
> You mention in your letter that Seaplane Adventures operates "charter flights." I further observe that Seaplane Adventures [sic] website advertises charter service from Sausalito to Tahoe City. . . . As such, under the current Shelter in Place Order, Mr. Singer could fly doctors and health care professionals to Tahoe City to assist with treating the pandemic. That is just one hypothetical example of "essential travel." There are several other categories of "essential travel" . . . .

To reiterate, Seaplane's certificates authorized it to provide "air transportation." True, Section 40101 defines "air transportation" as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft," and does not mention *intra*state travel, *e.g.,* in-state travel between Sausalito and Tahoe. But Section 41713(b)(1) applies to a *type of air carrier* (one that "*may* provide air transportation"). It does not further require that covered air carriers *only* provide interstate, foreign, or mail transportation. Nothing otherwise suggests Section 41713(b)(1) only applies to the subset of an air carrier's routes or services that provide interstate, foreign, or mail transportation. As long as an air carrier "may provide air transportation" within the meaning of Section 41713(b)(1), the section applies to all of its rates, routes, or services. Thus, Section 41713(b)(1) applied with equal force whether Seaplane flew to Tahoe or Texas.

Even though the County allowed certain types of charter travel, the health order's prohibition on non-essential travel was not "several steps removed" from routes and services. *Bernstein*, 3 F.4th at 1141. Nor was the health order's impact on rates, routes, or services merely "tenuous, remote, or peripheral." *Air Transp. Ass'n of Am.*, 266 F.3d at 1071. Unlike the

prohibition on sightseeing flights, the health order's ban on recreational charter travel *did* limit the type of routes and services Seaplane could offer its customers; namely, it could only offer charter flights for essential travel as set out in the County's health order. Though the County's goal to slow the spread of COVID-19 was reasonable, Section 41713(b)(1) includes no public health exception. *See, e.g., Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 374 (2008) (considering parallel language from the Federal Aviation Administration Authorization Act and holding, "[d]espite the importance of the public health objective, we cannot agree . . . that the federal law creates an exception on that basis, exempting state laws that it would otherwise pre-empt.").

This order also notes that prohibiting recreational charter travel to other destinations would place the burden on Seaplane to figure out passengers' reasons for traveling and whether those reasons abided by the County's health order. Large commercial air carriers have not been required to bear such a burden.

The County's health order stepped too far into the space cordoned off by the Airline Deregulation Act, but only as to the prohibition on charter travel to other destinations (and not as to sightseeing which does not count as a rate, route, or service as contemplated by Section 41713(b)(1)). Declaratory relief is warranted, therefore, only to the extent that the County prohibited Seaplane from offering charter services that transport passengers from Sausalito to another location (and leave them there) or transport passengers to Sausalito from elsewhere.

### 2. FIELD PREEMPTION.

Though this order concludes that conflict preemption invalidates the County's health order as to charter flights for travel and does not apply to recreational sightseeing, we must still consider whether *field preemption* invalidates the health order's prohibition on sightseeing flights. This order finds that it does not.

The "essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme." *Nat'l Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 734 (9th Cir. 2016). A two-step framework has been established for evaluating

7

field preemption: "The first step in determining whether [field preemption] exists is to delineate the pertinent regulatory field; the second is to survey the scope of the federal regulation within that field." *Ibid*.

The pertinent regulatory field must be narrowly defined. *See, e.g., Martin*, 555 F.3d at 811 ("[W]hen the agency issues 'pervasive regulations' in an area, like passenger warnings, the FAA preempts all state law claims in *that* area.") (emphasis in original). As such, this order considers the pertinent regulatory field to be aviation-related restrictions during a public health emergency.

No decision has definitively considered the field preemption question with regard to pandemic-related health orders impacting aviation, a fact that Seaplane conceded (Dkt. 72 at 2). Case law analyzing the preemption of laws touching on aviation-related health and safety risks have examined dangers specific to aircraft, not more general public health risks such as viral transmission. *See*, *e.g.*, *Montalvo,* 508 F.3d at 471 (finding state law negligence claim for failure to warn passengers of risk of deep vein thrombosis associated with flying preempted by FAA's "intent to occupy exclusively the entire field of *aviation safety*.") (emphasis added); *Martin*, 555 F.3d at 812 (holding "[b]ecause the agency [had] not comprehensively regulated airstairs, the FAA [had] not preempted state law claims that [an airplane's] stairs [were] defective."). In these cases, preemption was asserted by defendants as a shield to state law claims, not by plaintiffs as a sword to establish a claim for relief.

Congressional and FAA-led responses to the COVID-19 pandemic support the conclusion that federal aviation law has not occupied the field of aviation-related public health restrictions. Where Congress has passed aviation-related laws since the beginning of 2020, the goal has been mainly to support the aviation industry economically: funding for paid leave (Public Law No. 117-2, Sec. 7104; 15 U.S.C. § 9072); suspension of certain aviation excise taxes (Public Law No. 116-136, Sec. 4007; 15 U.S.C. § 9046); and appropriations for grants to airports and air carriers (Public Law No. 116-136, Sec. 22001; H. R. 133-872, Sec. 402). Other regulatory and rulemaking changes have included the easing of various training and recertification requirements (85 F.R. 38763 (effective June 6, 2020)); flexibility for scheduled maintenance requirements (InFO 20005 (dated December 29, 2020)); new penalties for passengers who assault, threaten, or

8

interfere with crewmembers' duties to enforce mask mandates (Compliance and Enforcement Bulletin No. 2021-3, Order 2150.3C CHG 5 (dated March 31, 2021)); *see also* https://www.faa.gov/coronavirus/).

Nonbinding FAA guidance, though not dispositive, further supports the conclusion that the County had the authority to prohibit recreational sightseeing during the pandemic. For instance, "Considerations for State, Local, and Territorial COVID-19 Restrictions That Impact Air Transportation," dated March 28, 2020, provided that localities "may wish to account for the following considerations when implementing any quarantine, movement, and/or screening requirements that impact air transportation," including that "[p]roposed measures cannot close a Federally-obligated airport absent prior FAA authorization, and must consider all essential aeronautical services." *Ibid*. A federally-obligated airport is one that receives federal funding. "Essential aeronautical services" include "scheduled or unscheduled passenger and cargo operations, to include charter and corporate aviation activities," "aircraft maintenance/repair," etc. *Ibid*. The guidance did not state that health orders must allow airports that are *not* federally-obligated to stay open or that localities cannot place limits on non-essential operations. Seaplane offers no evidence that it was a federally-obligated airport during the relevant period (or at any time) and, even if it was, the County did not "close" Seaplane. On the contrary, the health order permitted the essential aeronautical services set out in the FAA guidance.

In its response to the order to show cause, Seaplane also relied on *Gateway City Church v. Newsom*, 516 F.Supp.3d 1004 (N.D. Cal. Jan. 29, 2021) (Judge Edward J. Davila). That case did *not* decide the FAA preemption issue but considered preemption in aviation as potentially analogous to restrictions on places of worship. Seaplane relied on *Gateway* for the proposition that "the federal government does not categorically prohibit local governments from imposing public health ordinances on airports; rather, it has indicated that any such measures must be approved by the FAA" (RJN, Exh. 1). *Gateway*, however, relied on non-binding guidance specific to federally-funded airports. To reiterate, Seaplane has offered no evidence that it has received any federal funds. If anything, the federal government has a heightened interest in keeping federally-funded airports fully operational as compared to a small private business like

9

Seaplane. Even in the case of federally-funded airports, however, the guidance sanctioned restrictions on recreational activities:

> With the goal of keeping airports open to ensure access for the traveling public, emergency and medical equipment and supplies, and emergency transportation, FAA does not object to *temporarily* limiting recreational aeronautical activities that are covered by such restrictions.

"Information for Airport Sponsors Considering COVID-19 Restrictions or Accommodations" (May 29, 2020) (emphasis in original). The FAA's "Safety Alert for Operators" provides another example given its guidance that aviation workers "[f]ollow any . . . recommendations or requirements of national, state, or local authorities." Safety Alert for Operators No. 200009. Though FAA guidance suggests certain instances in which a health order may be preempted, it still supports the conclusion that local governments have leeway to implement COVID-related restrictions that impact recreational activities.

For these reasons, federal law has not been so pervasive in the field of aviation-related restrictions during a public health crisis to foreclose the County's prohibition on sightseeing flights during the COVID-19 pandemic.

### 3. DAMAGES.

Seaplane can seek declaratory relief but cannot recover damages under Section 1983 using a preemption theory because the claim fails the *Blessing* test:

> Under 42 U.S.C. § 1983, plaintiffs may sue state actors for violations of federal statutory as well as constitutional law. To do so, a plaintiff must assert the violation of a federal right, not merely a violation of federal law. Under the Blessing test, a particular statutory provision gives rise to a federal right if three requirements are met: (1) Congress must have intended that the provision in question benefit the plaintiff, (2) the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence, and (3) the statute must unambiguously impose a binding obligation on the States.

*Anderson v. Ghaly*, 930 F.3d 1066, 1073 (9th Cir. 2019) (citing *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)) (quotations omitted).

Seaplane's claim for preemption-related damages fails the *Blessing* test right out of the gate. "Under the first prong of the *Blessing* test, [courts] must . . . determine whether Congress intended to create a federal right." *Ibid*. To create a federal right, "a statute's text must be phrased in terms of the persons benefited" and use "rights-creating terms." *Ibid*. Section 41713(b)(1) does not include any rights-creating terms, for instance, a reference to air carriers' entitlement to fly. Instead, it merely restricts the scope of state authority to impinge upon rates, routes, and services of air carriers providing transportation. Because Section 41713(b)(1) has been "phrased as a directive to the state," it does "not create an enforceable right under [Section] 1983." *Id.* at 1074.

Because all three prongs of the *Blessing* test must be met to establish a federal right, failure of the first prong frees us from considering the second and third prongs. No damages are available under Seaplane's preemption-based Section 1983 theory.

## CONCLUSION

Federal law does not restrict the County's ability to prohibit recreational sightseeing flights during the COVID-19 pandemic. Thus, the County's health order fell squarely within local police power, except with regard to the prohibition on charter flights for travel to other locations (whether intrastate or interstate and regardless of passengers' reasons for traveling). Declaratory relief to this effect is warranted in the event that the County reinstates the health order. Damages are not recoverable.

**FINAL JUDGMENT** will be separately entered.

**IT IS SO ORDERED.**

Dated: November 22, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE